UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

|   |   |
|---|---|
| PATRICK PATT, on behalf of himself and all others similarly situated, ) ) ) ) Plaintiff, ) v. ) ) CALLAN ASSOCIATES, INC., ) ) Defendant. ) ) | No. 06 C 5199 |

## FIRST AMENDED CLASS ACTION COMPLAINT

Patrick Patt, on behalf of himself and all other similarly situated participants and beneficiaries in the Teachers' Retirement System of the State of Illinois ("TRS") between January 1, 2002 and the present day, brings this Class Action Complaint and alleges the following on information and belief:

## NATURE OF THE ACTION

1. The Illinois Pension Code ("ILPC") (40 ILCS 5/1-101 *et seq.*) requires a "fiduciary" of an Illinois pension fund to act solely in the interest of the fund and its participants. Between 2002 and 2006 defendant Callan Associates, Inc. ("Callan" or the "Defendant") was a party to a contract with the Teachers' Retirement System of the State of Illinois, a public fund, under which Callan was to provide investment advice and consulting services to the TRS Board of Trustees ("TRS Trustees"). The contract covering these services explicitly acknowledged Callan's role as a fiduciary. Callan's responsibilities included evaluating and recommending investment policies; assisting in the development of policies, procedures, and guidelines for the investment program; making recommendations for asset allocation; maintaining a database of investment

managers; evaluating the work of investment managers; and recommending the hiring, firing and retention of each investment manager. Despite Callan's role as a "gatekeeper" and its obligations as a fiduciary to TRS, Callan was paid consulting fees, membership dues and tuition payments from investment managers for Callan services. Callan simultaneously carried out its contractual duties in seeking, evaluating and recommending potential investment managers for TRS some of whom were Callan's clients. This acceptance of funds from investment managers who hoped to obtain or retain a contract with TRS was a conflict of interest in violation of Callan's obligations as a fiduciary to TRS under the Illinois Pension Code.

## I. JURISDICTION AND VENUE

2. The original Complaint for this action was filed in the Circuit Court of Cook County, Illinois, Chancery Division. The Court had jurisdiction over this matter pursuant to 735 ILCS 5/2-209(a)(1) as the Complaint derives from Callan's transaction of business in Illinois and breaches of fiduciary duty committed in this State. Venue was proper in Circuit Court pursuant to 735 ILCS 5/2-101 because Callan conducts business in Cook County and maintains its principal Illinois place of business at 120 North La Salle Street, Suite 2100, Chicago, IL 60602, in Cook County.

3. The Defendant removed this case to federal district court in accordance with 28 U.S.C. § 1441, citing diversity of citizenship as the basis for removal.

## II. PARTIES

**A.     Plaintiff.**

4.     **Plaintiff Patrick Patt**. Mr. Patt is a resident of Lake Forest, IL. He is a participant in the Teachers' Retirement System of the State of Illinois. Mr. Patt worked

in the Illinois education system for thirty-four (34) years, and before retiring he served as Superintendent of Oak Grove School District 68 in Green Oaks, Illinois.

**B.     Defendant.**

5.     **Defendant Callan Associates, Inc**. Callan sells investment advice and services to public and private pension plan sponsors, investment management firms, financial intermediaries, and mutual fund boards of directors.  Callan is a fiduciary of TRS by virtue of its position as an investment advisor that receives a fee for investment advice within the meaning of the Illinois Pension Code, 40 ILSC 5/1-101.2(2) and its contract with TRS wherein it acknowledges its status as a fiduciary.  The original contract and its three amendments place Callan in a fiduciary relationship with TRS from January 1, 2002 through September 30, 2006.

### III. FACTUAL BACKGROUND

**The Illinois Teachers' Retirement System:**

6.     The Teachers' Retirement System of the State of Illinois provides retirement annuities and other benefits for teachers, annuitants and beneficiaries.

7.     Members of TRS include all full-time, part-time, and substitute Illinois public school personnel employed outside the city of Chicago in positions requiring certification by the Illinois State Board of Education. Persons employed in certain state agencies relating to education are also TRS members.

8.     As of June 30, 2005, there were 155,850 active members and 87,328 inactive members in TRS, and 82,575 annuitants and beneficiaries receiving benefits.  As of June 30, 2005, the average monthly retirement pension payment was $3,043.00, according to the TRS website.

9. Funding for TRS benefits comes from member contributions, contributions by TRS-covered employers, the State of Illinois, and investment income.

10. The largest single source of funding comes from investment income earned on the assets held in trust by the TRS Trustees.

11. As of June 30, 2006, TRS held in trust $36.5 billion. This is adequate to cover only 62 percent of the pension and benefit obligations that TRS is legally required to pay to beneficiaries – a difference of over $20 billion.

12. Any difference will eventually have to be made up by one or more of the funding sources: member contributions, contributions by TRS-covered employers, the State of Illinois, or investment income.

**The TRS Investment Structure:**

13. TRS is administered by an eleven-member Board of Trustees: the Illinois superintendent of education, who serves in an ex-officio capacity; four trustees elected by contributing TRS members; four trustees appointed by the governor; and two trustees elected by TRS annuitants.

14. The TRS Trustees hire an "investment consultant" to assist them in investing fund assets. The investment consultant is responsible for providing the TRS Trustees with reports and recommendations regarding how to invest trust assets in accordance with the fiduciary standards imposed by state law and investment guidelines established by the TRS Trustees.

15. The Investment Policy of the Teachers' Retirement System of the State of Illinois, as adopted by the Board of Trustees on April 2, 2000, and periodically revised (generally referred to as the "TRS Investment Policy"), provides that the investment

consultant is hired by and reports directly to the TRS Trustees.

16. The TRS Investment Policy states that potential investment managers will be identified by the investment consultant based on a search of the consultants' database of investment managers and the criteria established by the TRS Trustees for a given investment project. The investment consultant is responsible for the creation and maintenance of the investment manager database. Investment mangers not in the consultant's database must apply for inclusion by submitting a completed questionnaire to the consultant prior to a specified screening date.

17. After narrowing the pool of candidates based on the search of its database, the investment consultant and TRS staff will rank the candidates and may send them a Request for Proposal ("RFP").

18. From the submitted RFPs the investment consultant and TRS staff choose the investment manager finalists and provide recommendations to the TRS Trustees.

19. Thereafter, the investment consultant and TRS staff are responsible for regularly monitoring and evaluating the performance of each investment manager, providing the TRS Trustees with reports, and recommending actions to be taken.

20. Overall, the investment consultant is responsible for making recommendations about which investment managers should be hired to manage and invest the TRS portfolio. The investment consultant is also responsible for reviewing the performance of investment managers and recommending their continued retention or termination to the TRS Trustees.

21. The investment consultant may also make recommendations to rebalance the TRS portfolio, including changes in the asset allocation mix and in risk tolerances.

Any such portfolio restructure would likely modify the types of investment managers TRS would hire and the size of funds for which the managers would be responsible.

22. According to the TRS Investment Policy, "[i]t is the Board [of Trustee]'s position that it is imperative for the Consultant to have an independent ability to inform the Trustees in the event of any concerns related to the System investment activity."

23. TRS had one investment consultant, Callan, and ninety-eight investment managers for a trust holding pension assets of $31.545 billion, as of June 30, 2004.

**Callan as the TRS Investment Consultant:**

24. In December 2001, TRS signed an Investment Consulting Agreement (the "Contract") with Callan effective from January 1, 2002 through December 31, 2002, with a possibility of extension.

25. The Contract made Callan the "investment consultant" responsible for providing independent advice regarding new investments and retention of current investments - advice which the TRS Trustees would rely upon.

26. The Contract required Callan to evaluate and recommend investment policies; assist in the development of policies, procedures, and guidelines for the investment program; and make recommendations for asset allocation (*i.e.*, how the portfolio should be diversified – what percentage of assets should be held in a given asset category such as bonds, stocks, real estate or cash – and how much should be entrusted to a given investment manager).

27. Under the Contract Callan was required to maintain a database of investment managers, evaluate the work of current and prospective TRS investment managers, and subsequently recommend the hiring and firing or retention of each

investment manager.

28. Callan's 2002 annual retainer from TRS for its investment advice under this Contract was $545,000.

29. Paragraph 7 of the Contract stated that Callan was a fiduciary "with respect to the System [TRS] within the meaning of the Illinois Pension Code, 40 ILCS 5/1-101 *et seq.*, and Contractor [Callan] shall discharge its duties under this Agreement solely in the interest of the participants and beneficiaries of the System and with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in an enterprise of like character and with like aims." Paragraph 7 goes on to state that "Contractor further acknowledges that the System's Board of Trustees will rely on the Contractor's expertise and experience regarding all services provided by Contractor."

30. In paragraph 16 of the Contract, under the heading "Conflict of Interest," Callan pledged the following: "[B]y signing this Agreement, [Callan] covenants that Contractor has no public or private interest, direct or indirect, and shall not acquire directly or indirectly any such interest which does or may conflict in any manner with the performance of Contractor's services and obligations under this Agreement… Contractor further covenants that, in the performance of this Agreement, no person having such interest shall be employed by Contractor."

31. On December 30, 2002, the TRS Trustees signed a two-year Contract extension entitled "Amendment to Investment Consulting Agreement" (hereafter the "Amended Contract") thus making Callan the investment consultant for TRS until January 1, 2005.

32. The Amended Contract entitled Callan to its annual retainer of $545,000, plus a bonus of $35,000 per private equity partnership, due and payable upon completion of private equity partnership due diligence services.

33. On December 15, 2005, Callan and the TRS Trustees entered into the "Second Amendment to Investment Consulting Agreement" (hereafter the "Second Amended Contract").

34. The Second Amended Contract extended the previous contracts and retained Callan as the investment consultant on a month-to-month basis beginning January 1, 2006. The Second Amended Contract was terminable by TRS upon 10 days prior written notice to Callan.

35. The Second Amended Contract replaced the prior conflict of interest paragraph with the following language, which was at least as strict as the initial contract: "Contractor does not have any public or private interest, direct or indirect, and shall not acquire directly or indirectly any such interest which does or may conflict in any manner with the performance of Contractor's obligations under this Agreement. Contractor has disclosed, and agrees it is under a continuing obligation to disclose to TRS, financial or other interests, public or private, direct or indirect, that may be a potential conflict of interest that would prohibit Contractor from having or continuing this Agreement. Contractor further certifies that, in the performance of this Agreement, no person having any such interest shall be employed by Contractor. Membership in the Teachers' Retirement System of the State of Illinois does not constitute a conflict of interest within the meaning of this paragraph."

36. The "Third Amendment to Investment Consultant Agreement," (hereafter

"Third Amended Contract") signed on March 15, 2006, modified the prior month-to-month agreement. The Third Amended Contract limited Callan's investment advice to only TRS' real estate portfolio. As a result, Callan was no longer responsible for offering advice on TRS' other types of investments, *e.g.,* equity (stocks) and fixed income (bonds).

**Callan's Other Activities:**

37. Part of Callan's responsibility under its Contract with TRS has been evaluating the performance of individual investment managers, both in selecting new investment managers for TRS and in recommending whether existing investment managers should continue to work for TRS. Callan's fiduciary obligations to TRS are paramount in evaluating and recommending whether or not to hire and retain investment managers.

38. Callan did not provide TRS with any documents disclosing potential or actual conflicts of interest made by Callan in accord with paragraph 16 of its December 2001 Contract signed with TRS.

39. Notwithstanding Callan's fiduciary obligation to TRS, Callan offers consulting services to investment managers which include strategic advice, investment research, performance evaluation software, and education.

40. Callan operates the "Callan Investments Institute" which offers programs that purport to teach investment managers how to communicate with and market to clients, pension plan sponsors and consultants. Callan charges investment managers from $16,000 to $54,000 per year to attend the Callan Investments Institute.

41. Callan also operates the "Callan College," which offers seminars marketed

to investment managers. According to the brochure on Callan's website, one of these seminars will benefit investment managers by explaining how to "conduct a successful meeting and a winning presentation with both plan sponsors' and consultants." Callan goes on to claim it will "arm" investment managers with "an in-depth knowledge of plan sponsors' decision making process." The Callan College registration fee per session is $2,500 per person.

**Callan's Irreconcilable Conflict:**

42. As the sole investment consultant for TRS from 2001 through 2006, Callan had unique and marketable knowledge to sell to investment managers regarding the manner in which pension funds such as TRS made investment manager hiring decisions and how investment managers could craft "winning" presentations to impress investment consultants such as Callan.

43. According to Callan's responses to a Department of Labor and United States Securities and Exchange Commission questionnaire, fees collected from investment managers through offerings such as the Callan Investments Institute and Callan College account for a significant percentage of Callan's annual revenue. In 2005, Callan noted that it derived 30% of its revenue from investment manager consulting services.

44. A number of the investment managers paying Callan for consulting services and seminars were also vying for Callan's support in their competition for a share of the TRS fund to manage.

45. Callan's receipt of monies from investment managers competing to manage TRS funds placed Callan in conflict with its responsibility to objectively

recommend and judge the performance of, investment managers for TRS, and, therefore, was a breach of Callan's duty of loyalty to TRS.

46. On information and belief, after Callan accepted its position as TRS' "independent investment consultant," there were numerous occasions on which it was responsible for recommending the hiring or retention of investment managers for TRS who had or would pay seminar or consulting fees to Callan.

47. While Callan was the investment consultant for TRS with the responsibility to advise on asset allocation, the Trustees rebalanced the portfolio several times, adjusting the risk levels, sizes, styles and sectors of TRS' investment portfolio. Each of these changes affected the number and types of investment managers needed to manage investments for TRS and required Callan's unbiased consideration of the fit between funds and their managers.

**Underperforming Investment Managers:**

48. On information and belief, TRS has retained investment managers recommended by Callan which had paid Callan fees and which underperformed their peers.

49. After winning the TRS Contract, Callan recommended the hiring of four investment managers it had screened to handle portions of the TRS portfolio: Artisan Partners L.P., Boston Asset Management L.P., Harris Associates L.P. and J&W Seligman & Co., Inc.

50. None of these firms had been hired by TRS at the time Callan was retained.

51. All four of the above mentioned investment managers paid money to

Callan for seminars and/or consulting services.

52. TRS maintains a "Watch List" of retained investment managers that underperform other TRS investment managers, ascertained by comparison to benchmarks or by the investment manager ranking in the bottom quartile of investment returns of its peer group for two consecutive quarters.

53. TRS determined all four of these money managers to be underperforming and placed them on the TRS Watch List.

54. Underperforming investment managers reduce TRS returns money through the lost opportunity to make greater returns in alternative investments.

55. On information and belief, Callan made similar recommendations in subsequent years that prevented TRS from maximizing returns.

56. Instead of putting the interests of TRS first and foremost, Callan was conflicted by its consultations and fee-for-service arrangements with both TRS and the investment managers Callan reviewed and recommended under a purported mantle of independence, expertise, and loyalty.

## IV. APPLICABLE LAW

57. The Teachers' Retirement System of the State of Illinois was created for the purpose of providing retirement annuities and other benefits for teachers, annuitants and beneficiaries. All of its business shall be transacted, its funds invested, and its assets held in such name. 40 ILCS 5/16-101, *et seq.*

58. The Illinois Pension Code ("ILPC") defines a "**fiduciary**" with respect to a pension fund or retirement system established under the ILPC as a person who: "(1) exercises any discretionary authority or discretionary control respecting management of

the pension fund or retirement system, or exercises any authority or control respecting management or disposition of its assets; (2) renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of the pension fund or retirement system, or has any authority or responsibility to do so…".
40 ILCS 5/1-101.2.

59. The duties of fiduciaries "with respect to a retirement system or pension fund established under this Code shall discharge his or her duties with respect to the retirement system or pension fund solely in the interest of the participants and beneficiaries and: (a) For the exclusive purpose of: (1) Providing benefits to participants and their beneficiaries;  and (2) Defraying reasonable expenses of administering the retirement system or pension fund; (b) With the care, skill, prudence and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims; (c) By diversifying the investments of the retirement system or pension fund so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so;  and (d) In accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund." 40 ILCS/5-109.

60. Under §40 ILCS/5-114,  "(a) Any person who is a fiduciary with respect to a retirement system or pension fund established under this Code who breaches any duty imposed upon fiduciaries by this Code shall be personally liable to make good to such retirement system or pension fund any losses to it resulting from each such breach, and to restore to such retirement system or pension fund any profits of such fiduciary which have been made through use of assets of the retirement system or pension fund by the

fiduciary, and shall be subject to such equitable or remedial relief as the court may deem appropriate, including the removal of such fiduciary. (b) No person shall be liable with respect to a breach of fiduciary duty under this Code if such breach occurred before such person became a fiduciary or after such person ceased to be a fiduciary."

61. The Illinois Pension Code provides a mechanism for civil enforcement such that, "a civil action may be brought by the Attorney General or by a participant, beneficiary or fiduciary in order to: (a) Obtain appropriate relief under Section 1-114 of this Code; (b) Enjoin any act or practice which violates any provision of this Code; or (c) Obtain other appropriate equitable relief to redress any such violation or to enforce any such provision." 40 ILCS/5-115.

## V. CLAIM FOR RELIEF

### Breach of Fiduciary Duty by Callan

### (Violation of § 40 ILCS 5/1-101.2)

62. Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

63. At all relevant times, Callan was a fiduciary within the meaning of § 40 ILCS 5/1-101.2, by rendering investment advice for a fee to the TRS Trustees. Callan's fiduciary status was acknowledged by its written and signed Contract, and amendments thereto, with TRS.

64. Callan violated § 40 ILCS/5-109's fiduciary duty standards by engaging in a business interest that conflicted with the interest of TRS, namely, receiving fees from investment managers while contracting to provide independent investment advice and review of investment managers for the TRS.

65. Even though Callan knew its obligations under the TRS Contract and the ILPC required it to avoid entering into any conflicts and employing anyone with an interest which would conflict TRS, Callan regularly sold training sessions and membership in the "Callan Investments Institute" to investment managers whom Callan would be required to evaluate on behalf of TRS.

66. By soliciting and accepting fees from the parties that Callan was responsible for evaluating independently and with unconflicted loyalty to TRS, Callan placed itself in an irreconcilable conflict of interest and breached its duty to act "solely in the interest of the participants and beneficiaries" of TRS. 40 ILCS/5-109.

67. As a direct and proximate result of these breaches of duties, Callan received millions of dollars in fees from TRS at the same time that Callan was receiving 30% of its annual income from the sale of investment managers consulting services and seminars or events offered through "Callan College" or the "Callan Investments Institute." The ILPC prohibits such arrangements, which would result in losses to TRS when Callan recommended underperforming investment managers to the TRS, based on Callan's conflicted relationships.

68. Pursuant to § 40 ILCS 5/1-114, Callan is liable to restore to TRS any profits Callan made through this fiduciary breach and all losses suffered by TRS as a result of the breach of Callan's fiduciary duty. Callan is also subject to such equitable or remedial relief as the court may deem appropriate.

## VI. THE CLASS

69. **The Class.** This action may be brought and properly maintained as a class action pursuant to the Illinois Code of Civil Procedure, 735 ILCS 5/2-801 *et seq*.

Plaintiff brings this action on behalf of himself and a class of all other similarly situated, as defined herein.

  (a) Plaintiff requests certification of a nationwide class as follows: "All current and former participants and beneficiaries of the Teachers' Retirement System of the State of Illinois between January 1, 2002 and the present."

70. **Numerosity**. The proposed class numbers in the hundreds of thousands and is geographically dispersed across the country so that joinder is impractical.

71. **Common Questions of Law and Fact**. There are common questions of law and fact based on Callan's conduct as alleged herein. Such questions are common to all class members and predominate over any question affecting only individual class members. The questions of law and fact common to the class include, but are not limited to:

  (a) Whether Callan had a conflict of interest?

  (b) Whether Callan breached its fiduciary duty?

  (c) What profits Callan made as a result of its position of trust, as a fiduciary, with TRS?

  (d) What losses TRS suffered as a result of Callan's breach of fiduciary duty?

72. **Typicality of Claims**. Plaintiff's claims are typical of members of the class – *i.e.,* current and former participants and beneficiaries of TRS – because all claims

are based on the same legal and remedial theories, which include making the plan whole, in lieu of individual causes of action.

73. **Adequate Representation**. Plaintiff will adequately and fairly represent and pursue the interest of the class members. Plaintiff understands the nature of the class claims herein. Plaintiff sustained similar injuries as the members of the class he seeks to represent and his interest are not antagonistic to the claims of the class members who he represents. Plaintiff has retained counselors who are experienced in pension plan class action litigation.

74. **Appropriateness of Class Action**. Class litigation is an appropriate method for a fair and efficient adjudication of claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of similarly-situated persons and entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would require, as envisioned by the civil relief mechanism of the ILPC as it permits either the Attorney General, a participant, a beneficiary or a fiduciary to initiate suit on behalf of the class.

75. **Case Management.** Plaintiff is unaware of any difficulties likely to be encountered in the management of this case that would preclude its maintenance as a class action.

## VII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff prays for relief as follows:

76. Declare that Callan breached its fiduciary duties under the ILPC;

77. Issue an order compelling Callan to disgorge all fees paid and incurred, directly or indirectly, by TRS, including disgorgement of profits thereon;

78. Order equitable restitution and other appropriate equitable monetary relief against Callan;

79. Award such other equitable or remedial relief as may be appropriate, including the permanent removal from and barring of Callan from any positions of trust with respect to any funds managed by TRS and the appointment of an independent fiduciary to review the prudence of the continued investment of TRS funds with investment groups associated with Callan;

80. Enjoin Callan from any further violations of its ILPC fiduciary responsibilities, obligations, and duties;

81. Award Plaintiff his attorneys' fees and costs; and

82. Award such other and further relief as the Court deems equitable and just.

Respectfully Submitted,

By: /s/ Jennifer H. Strouf
David A. Novoselsky
Leslie J. Rosen
**NOVOSELSKY LAW OFFICES**
120 North LaSalle Street, Suite 1400
Chicago, Illinois 60602-2401
Tel: (312) 346-8930
(Attorney No. 24578)

J. Brian McTigue (admitted *pro hac vice*)
Gregory Y. Porter (admitted *pro hac vice*)
Cornish F. Hitchcock (admitted *pro hac vice*)
Jennifer H. Strouf (IL Bar No. 6287496, admitted *pro hac vice*)
**McTIGUE & PORTER LLP**

                                                        5301 Wisconsin Avenue, NW, Suite 350
                                                        Washington, DC  20015
                                                        Tel: 202-364-6900

                                          *Attorneys for Plaintiff Patrick Patt*

December 5, 2006

## CERTIFICATE OF SERVICE

    I certify that on the 5th day of December, 2006, I caused this document to be filed electronically with the Clerk of Court using the CM/ECF system, which sent notification to Paul E. Slater, Matthew T. Slater, Scott Forrest Hessell, and Robert D. Cheifetz, Sperling & Slater, P.C., 55 West Monroe Street, Suite 3200, Chicago, IL 60603.

                                                              /s/ Jennifer H. Strouf